UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| BRANDON M. REED )<br>(Social Security No. XXX-XX-3582), )<br>)<br>          Plaintiff, )<br>)<br>     v. )<br>)<br>MICHAEL J. ASTRUE, Commissioner )<br>of the Social Security Administration, )<br>)<br>          Defendant. ) | 3:10-cv-139-WGH-RLY |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7, 9) and an Order of Reference entered by Chief Judge Richard L. Young on February 9, 2011 (Docket No. 16).

**I. Statement of the Case**

Plaintiff, Brandon M. Reed, seeks judicial review of the final decision of the agency, which found him not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f). The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on February 19, 2009, alleging disability since December 17, 2008. (R. 116-19). The agency denied Plaintiff's application both initially and on reconsideration. (R. 77-80, 82-84). Plaintiff appeared and

testified at a hearing before Administrative Law Judge Stuart T. Janney ("ALJ") on November 3, 2009. (R. 30-74). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 30). On December 14, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 14-25). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on September 7, 2010, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on November 15, 1979, Plaintiff was 30 years old at the time of the ALJ's decision, with a high school education. (R. 23-24). His past relevant work experience included a job as a canvas worker and net maker (both medium, skilled jobs). (R. 23).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

On August 12, 2008, Plaintiff complained of neck pain (R. 274), but X-rays of his cervical spine on August 13, 2008, were normal. (R. 275).

Plaintiff saw Cyllene Briones, M.D., on November 14, 2008, reporting mood swings for the past several years and explaining that "my girlfriend thinks I have Bipolar Disorder." (R. 259-60). Plaintiff reported working at North American Green in erosion control and reported working ten hours a day four

days a week, but he did not like working there because he did not like his co-workers, who were all "drugheads." (R. 259). He reported taking care of his grandparents, who need him to run errands, take them to doctors' appointments, go grocery shopping, and do chores. (R. 259). He was alert, oriented, and adequately groomed upon examination and exhibited some anxiety; memory, attention, and concentration were "without significant impairment," and he denied homicidal or suicidal thoughts. (R. 260). Dr. Briones diagnosed mood disorder and depressive disorder with anxiety, assigned a Global Assessment of Functioning ("GAF") score of 60-65, opined that Plaintiff had mild to moderate depressive symptoms, and prescribed medication. (R. 260).

At a follow-up appointment on December 12, 2008, Plaintiff reported that his symptoms were "much better," with "noticeable improvement" in his mood. (R. 258). He was also getting along much better with his "wife" and people at work. He was also sleeping much better. (R. 258). He was to follow up in six to eight weeks. (R. 258).

Plaintiff sought treatment at Deaconess Cross Pointe for depression and thoughts of suicide on March 10, 2009. (R. 277-94). He was alert and oriented. (R. 277). Plaintiff reported elevated symptoms since being laid off from work and reported thoughts of shooting himself with one of his guns. (R. 279). Plaintiff reported financial stress as well as stress because his grandparents were "fussing" at him. (R. 284). Plaintiff was assigned a current GAF score of 35. (R. 292). He declined treatment and discharged himself the same day. (R. 292).

On March 24, 2009, Plaintiff reported that he was experiencing increased feelings of depression since losing his job. (R. 327-31). Due to lack of insurance, Plaintiff was examined by licensed social worker Brenda Meyer, instead of Dr. Briones. (R. 327-28). Plaintiff reported that he had lost his job and was fearful that he would not be able to find another job because "he has never been able to keep a job because of his mood swings and tendency to think that the people he worked with were stupid and he knew more than them." (R. 327). Upon examination, Plaintiff was moderately depressed and anxious, cooperative and oriented, adequately groomed, logical and coherent, and preoccupied with "past hurts." (R. 328). Plaintiff exhibited fair attention and concentration and, although he reported problems with memory, his memory appeared to be intact. (R. 328). Ms. Meyer felt Plaintiff's prognosis was good with therapy and continued medication. (R. 329).

Plaintiff started therapy with social worker Andrew Puntney on April 8, 2009. (R. 332). It was noted that Plaintiff had a negative attitude and participated minimally. (R. 332). On April 14, 2009, Plaintiff did not show up for his appointment. (R. 333).

On April 27, 2009, Plaintiff underwent a consultative examination with Jeffrey Gray, Ph.D. (R. 297-300). Plaintiff complained of significant depression with loss of interest in activities, lack of desire to get out of bed, excessive sleeping, poor concentration, and thoughts of suicide, but he had no plan to act upon those thoughts. (R. 297). Plaintiff exhibited good grooming and hygiene and a flat, depressed affect; he was oriented and had no signs of anxiety; and

attention and concentration were in the "low normal" range. (R. 297-98). Plaintiff reported that he sleeps a lot, cooks, shops for groceries, and does chores when he is not feeling depressed. (R. 298). He also explained that he had a girlfriend, interacted with family, and went to church, but he did not have other friends. (R. 299). Dr. Gray opined that, strictly due to borderline intellectual functioning, Plaintiff would have great difficulty with complex or detailed tasks; that Plaintiff could perform simple, repetitive tasks that did not require strenuous speed or quota components; and that he would have difficulty relating consistently to co-workers or supervisors. (R. 299-300). He also opined that Plaintiff would have difficulty handling work stress, "but would do better for very simple types of tasks," and that Plaintiff "would appear to be someone who is prone to decompensation secondary to his bipolar situation." (R. 300). He diagnosed Plaintiff with bipolar disorder, most recent episode depressed, and borderline intellectual functioning; he assigned a GAF score of 55. (R. 300).

Plaintiff saw Dr. Briones on May 15, 2009; he reported discontinuing one of his medications and complained of mood instability. (R. 335). Plaintiff had a depressed mood and anxious affect, but he was oriented, had normal thought processes, his memory was intact, his intellectual functioning was average, his attention/concentration was adequate, and his judgment was fair. (R. 335). Another report dated May 15, 2009, indicates that Plaintiff dropped out of services with Dr. Briones. (R. 337).

Plaintiff underwent a physical consultative examination on May 26, 2009, with Beth Joos, M.D. (R. 320-23). Dr. Joos indicated that Plaintiff's chief

complaint was bipolar disorder; Plaintiff had been placed on medication which had helped his depression, but he had recently been admitted for suicidal ideations. (R. 320). Plaintiff was poorly groomed and exhibited a flat affect; his physical examination was entirely negative. (R. 321-22). Dr. Joos opined that Plaintiff could sit or stand for an unlimited amount of time, walk up to a few blocks, lift and carry ten pounds frequently, and climb a few flights of stairs. (R. 322). She also opined that Plaintiff would perform best in a job that required little interpersonal interaction and did not rely heavily on social skills. (R. 322).

Plaintiff was treated by David Lippman, M.D., from May to July 2009. (R. 344-51). Plaintiff was cooperative, alert, and pleasant upon examinations with a flat affect and good orientation. (R. 344, 346, 348). It was noted on June 15, 2009, that Plaintiff was weed eating. (R. 346). On July 10, 2009, Plaintiff reported that he had refused to see a counselor in Dr. Briones' office. (R. 348).

On August 20, 2009, Plaintiff telephoned Southwestern Behavioral Healthcare indicating that he had a gun pointed at his head. (R. 362). Mr. Puntney talked Plaintiff into removing the gun from his head and waited on the phone until EMS personnel arrived, but was disconnected as he heard sirens in the background. (R. 332). Plaintiff apparently ended up shooting himself in the left shoulder after he tried to shoot himself in the chest. (R. 364). Plaintiff had been arguing with his grandfather about getting a job. (R. 364). When Plaintiff was examined the next day, he indicated that he would "never harm himself again," and his family confirmed that they had removed all the guns from the

home and were comfortable with Plaintiff's discharge from the hospital. (R. 364). Plaintiff was discharged on August 22. (R. 364).

Plaintiff saw Willard Whitehead, M.D., on September 1, 2009. (R. 365-67). Plaintiff reported anxiety and depression. (R. 365). Plaintiff was cooperative and alert throughout the examination and exhibited good grooming, an appropriate affect, unremarkable thought content, normal speech, intact memory, good attention and concentration, average intellectual functioning, and limited judgment and insight. (R. 366). Plaintiff's suicidal thoughts had "all but cleared," and Dr. Whitehead noted that all guns had been removed from Plaintiff's home. (R. 366-67). His GAF was 47 current, 55 highest in the past year. (R. 367).

On September 10, 2009, Plaintiff called and tried to have an additional medication added, but Dr. Whitehead indicated that was unnecessary. (R. 371). Plaintiff did not show up for his scheduled appointment with Dr. Whitehead on September 15, 2009. (R. 372). In a September 25, 2009 note, Dr. Whitehead reported that Plaintiff had "definite problems with compliance" due to missed appointments and overtaking his medications. (R. 373-74).

On November 10, 2009, Dr. Whitehead completed an assessment of Plaintiff's ability to perform mental work-related activities. (R. 376-80). He opined that Plaintiff was markedly limited in his abilities to understand, remember, and carry out detailed directions, make judgments on simple work-related decisions, perform and complete tasks at a consistent pace, maintain attention and concentration, interact appropriately with the public and others in

-7-

the work setting, and respond appropriately to changes in a routine work setting. (R. 376-77). Dr. Whitehead reported that these impairments were due to Plaintiff's bipolar disorder, which caused difficulty with memory and concentration. (R. 377). Dr. Whitehead also opined that Plaintiff had an extreme limitation of his abilities to behave predictably or in an emotionally stable manner, tolerate even low-stress work, and respond appropriately to work pressures. (R. 378-79). Finally, Dr. Whitehead opined that Plaintiff could not manage his own money, if he received benefits. (R. 380).

### 2. State Agency Review

On May 13, 2009, a state agency psychologist, Stacia Hill, Ph.D., reviewed the medical records. (R. 302-18). She opined that Plaintiff was moderately limited in his abilities to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods; she found that Plaintiff was not otherwise significantly limited by his mental impairments. (R. 316-17). F. Kladder, Ph.D., affirmed these findings on August 6, 2009. (R. 352).

J.V. Corcoran, M.D., on June 5, 2009, reviewed the medical records, including Dr. Joos's report, and opined that Plaintiff did not have a "severe" physical impairment. (R. 325). M. Brill, M.D., affirmed Dr. Corcoran's findings on August 7, 2009. (R. 353).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to

preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2013; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 16). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe: depressive disorder; anxiety disorder; and bipolar disorder. (R. 16). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible. (R. 19-22). Consequently, the ALJ concluded that Plaintiff retained the RFC for work at all exertion levels except that he is limited to simple repetitive tasks for two hours at a time that require little decision making in an environment that is not stringently production or quota-based; he cannot perform assembly line work; and he is allowed occasional contact with supervisors/co-workers, but no contact with the public. (R. 18). The ALJ opined that Plaintiff did not retain the RFC to perform his past work. (R. 23). However, Plaintiff could perform a substantial number of jobs in the

regional economy, including janitor/cleaner (6,000 light and 29,000 medium jobs) and dishwasher (9,000 jobs). (R. 24). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 25).

## VI. Issues

Plaintiff has essentially raised one issue. The issue is as follows:

**Whether the ALJ treated all medical opinion evidence properly.**

Plaintiff's brief raises three issues with the ALJ's decision. However, all three issues focus on the way that the ALJ examined the medical opinion evidence, including the weight he gave to various treating and examining sources. 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s)

of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the

more weight we will give that opinion. The better an
explanation a source provides for an opinion, the more
weight we will give that opinion. Furthermore, because
nonexamining sources have no examining or treating
relationship with you, the weight we will give their
opinions will depend on the degree to which they
provide supporting explanations for their opinions. We
will evaluate the degree to which these opinions
consider all of the pertinent evidence in your claim,
including opinions of treating and other examining
sources.

(4) Consistency. Generally, the more consistent an
opinion is with the record as a whole, the more weight
we will give to that opinion.

(5) Specialization. We generally give more weight to
the opinion of a specialist about medical issues related
to his or her area of specialty than to the opinion of a
source who is not a specialist.

(6) Other factors. When we consider how much weight
to give to a medical opinion, we will also consider any
factors you or others bring to our attention, or of which
we are aware, which tend to support or contradict the
opinion. For example, the amount of understanding of
our disability programs and their evidentiary
requirements that an acceptable medical source has,
regardless of the source of that understanding, and the
extent to which an acceptable medical source is
familiar with the other information in your case record
are relevant factors that we will consider in deciding
the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

In this case, Plaintiff finds fault in several of the ways the ALJ treated the medical opinion evidence. He complains that the ALJ improperly rejected Dr. Gray's opinion that Plaintiff was prone to decompensation. (R. 300). He argues that the ALJ's decision to reject Dr. Whitehead's findings is not supported by substantial evidence. He also alleges that the ALJ relied too heavily on Plaintiff's

activities of daily living, given Plaintiff's diagnosis of bipolar disorder. Additionally, he argues that the ALJ improperly rejected Dr. Joos's finding that Plaintiff could lift and carry only ten pounds. (R. 322). And, he argues that the ALJ impermissibly sorted through various GAF scores to find one that supported his findings, while disregarding the rest. After a careful examination of all of the medical records, Plaintiff's activities of daily living, and the ALJ's findings, the court concludes that we can trace the path of the ALJ's decision, and it must be affirmed.

In examining the entire longitudinal record concerning Plaintiff's mental health treatment, it is clear that there was substantial evidence to support the ALJ's findings. The ALJ, for example, reasonably relied upon the opinions of two state agency psychologists who opined that Plaintiff suffered from only moderate mental limitations. (R. 316-17, 352). Additionally, a mental status exam with Dr. Briones just a month prior to Plaintiff's alleged onset date revealed that Plaintiff worked long hours while also taking care of his grandparents. Dr. Briones found relatively normal results and assigned a GAF score of 65, which revealed only mild symptoms. (R. 259-60). On follow-up just five days before Plaintiff's alleged onset date, he was doing much better. (R. 258). It is important to note that the only records that indicated more severe problems spanned from March 2009 (three months after Plaintiff's alleged onset date) to September 2009, a period of only six months. Even given this extremely short period of time in which Plaintiff's condition was arguably worse, the records reveal that Plaintiff was noncompliant, as follows: in April 2009, Plaintiff was missing

therapy sessions, and not being cooperative (R. 332-33); in May 2009, Plaintiff was not taking his medications and dropped out of treatment with Dr. Briones (R. 335, 337); and in September 2009, Dr. Whitehead indicated that Plaintiff was noncompliant (R. 373-74). In addition to his noncompliance, Plaintiff was dishonest about his work history; he claimed that he had never been able to keep a job in part because of his mood instability. (R. 327). Yet, Plaintiff's earnings record revealed that he has spent most of his adult life (from age 19 to 27) working for one employer. (R. 124-26).

In addition, the ALJ was justified in his rejection of several pieces of medical opinion evidence. First, concerning Dr. Gray's opinion that Plaintiff was "prone to decompensation," the court notes that Dr. Gray rendered that opinion in May 2009. (R. 300). At that time, Plaintiff had only suffered one episode of decompensation in which he was admitted to the hospital with thoughts of suicide but no plan. The hospitalization lasted less than a day and did not even qualify as an episode of decompensation of extended duration according to 20 C.F.R Part 404, Subpart P, Appendix 1. It is true that Plaintiff suffered a second episode of decompensation (this time a three-day hospital stay after Plaintiff shot himself in the shoulder) after Dr. Gray's exam. However, the ALJ reasonably examined the entire record and concluded that Dr. Gray's opinion concerning decompensation was "speculation." (R. 23).

Second, concerning Dr. Whitehead's opinions that Plaintiff suffered from several marked and extreme limitations, the court notes that Plaintiff only visited Dr. Whitehead on two or three occasions in September 2009, so he does not

appear to qualify as a treating physician and his opinions are, therefore, not entitled to controlling weight. Even if Dr. Whitehead was a treating physician, the ALJ was free to reject his opinions. Such extreme findings were inconsistent with Dr. Whitehead's September 1, 2009 exam of Plaintiff in which he found appropriate affect, unremarkable thought content, normal speech, intact memory, good attention and concentration, average intellectual functioning, and limited judgment and insight. (R. 366). And, these findings were inconsistent with the state agency doctors who opined that Plaintiff only suffered from moderate limitations. Third, the ALJ did not rely too heavily on Plaintiff's activities of daily living to disregard Plaintiff's bipolar disorder. The ALJ merely referenced Plaintiff's activities of daily living as one of several reasons why Plaintiff's mental limitations were not as severe as he alleged. The ALJ also referenced: (1) several exams that revealed relatively mild or moderate symptoms, (2) the fact that Plaintiff was noncompliant either by not taking medication or not attending therapy sessions; and (3) the opinions of the state agency physicians who opined that Plaintiff only suffered from moderate impairment. This case is, therefore, contrary to Plaintiff's claims, not akin to *Bauer v. Astrue*.

Fourth, as for Dr. Joos's opinion that Plaintiff can lift ten pounds frequently, the ALJ was justified in rejecting this finding, as it was completely unsupported by the medical records, as well as Dr. Joos's examination of Plaintiff. X-rays of Plaintiff's cervical spine in August 2008 were normal. (R. 275). Furthermore, Dr. Joos acknowledged that Plaintiff had a normal physical

exam and normal range of motion exam. (R. 322). Therefore, there was no objective medical evidence in the record to support limiting Plaintiff to lifting only ten pounds.

Finally, concerning the ALJ's treatment of the various GAF scores, the court notes that the social security regulations and case law do not require an ALJ to determine the extent of an individual's disability by a GAF score alone. *Wilkins v. Barnhart,* 69 Fed.Appx. 775, 780 (7th Cir. 2003). Immediately preceding Plaintiff's alleged onset date, Plaintiff was assessed with a GAF score of 60-65, which revealed only mild impairment. Plaintiff did have a GAF score of 35 when he was hospitalized in March 2009, but by May 2009 he had improved to a GAF score of 55, indicating only moderate impairment. It is also important to remember that Plaintiff was noncompliant. There is substantial evidence in the record that Plaintiff's symptoms improve when he is on medication and that he can function with only mild to moderate impairment. Therefore, the ALJ did not arbitrarily pick one GAF score while rejecting others.

In summary, the ALJ's decision is supported by substantial evidence and the ALJ reasonably rejected several opinions from Dr. Joos, Dr. Whitehead, and Dr. Gray.

### VII. Conclusion

The ALJ's decision concerning the various medical opinions of record is supported by substantial evidence, and the court can trace the path of the

-17-

ALJ's reasoning. The final decision of the Commissioner is, therefore,

**AFFIRMED.**

**SO ORDERED** the 28th day of February, 2011.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Lane C. Siesky
SIESKY LAW FIRM, PC
lane@sieskylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov